**UNITED STATES of America**

v.

**Vincent GIGANTE, Defendant.**

**No. CR 93–368 (JBW).**

United States District Court,
E.D. New York.

Jan. 5, 1998.

Zachary W. Carter, U.S. Attorney, Brooklyn, NY by Andrew Weissmann, George A. Stamboulidis, Daniel S. Dorsky, for U.S.

Culleton, Marinaccio & Foglia, White Plains, NY by James J. Culleton, Michael A. Marinaccio, Philip Foglia, Steven R. Kartagener, New York, NY, for Defendant.

### AMENDED MEMORANDUM, ORDER, AND JUDGMENT

WEINSTEIN, Senior District Judge.

I.  Introduction ...............................................438

II.  Provisional Sentence vs.  Guidelines Sentence ................................438

III.  Presentence Recommendations. ...........................................439
    A.  Department of Probation .............................................439
        1.  Applicable Guidelines Range for Incarceration .........................439
        2.  Fines and Cost of Imprisonment ....................................439
        3.  Restitution...........................................439

    4.  Special Assessment ...............................................439
    5.  Post–Incarceration Supervised Release ..............................439
  B.  Prosecution........................................................439
  C.  Defendant.........................................................440

IV.  General Sentencing Considerations ......................................440

V.  Departures Under Guidelines ...........................................441

VI.  Conclusion ...........................................................443

## I. Introduction

Vincent Gigante has been convicted after a jury trial of five criminal counts: racketeering (RICO), 18 U.S.C. § 1962(c), racketeering conspiracy, 18 U.S.C. § 1962(d), extortion conspiracy, 18 U.S.C. § 1951(a), labor payoff conspiracy, 18 U.S.C. § 371, and conspiring to murder in aid of racketeering, 18 U.S.C. § 1959(a)(5). A motion for a new trial has been denied. *United States v. Gigante,* 982 F.Supp. 140 (E.D.N.Y.1997). Defendant is competent to be sentenced. *United States v. Gigante,* —— F.Supp. ——, 1998 WL 94911 (E.D.N.Y. Jan. 5, 1998).

For reasons indicated below, defendant is sentenced to twelve years imprisonment, a fine of $1,250,000, a special assessment of $250, and five years of supervised release following imprisonment.

## II. Provisional Sentence vs. Guidelines Sentence

Section 4244 of the United States Code provides for provisional sentencing of a competent defendant who is "presently suffering from a mental disease or defect" and who "should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care and treatment." 18 U.S.C. § 4244(d). Provisional sentences are for "the maximum term authorized by law." 18 U.S.C. § 4244(d). "Maximum term" in this context has been interpreted to mean the statutory maximum and not the maximum sentence under the Guidelines. *See, e.g, United States v. Moses,* 106 F.3d 1273, 1275 n. 1 (6th Cir.1997) (" 'the maximum term authorized by the law' refers to the statutory maximum for the offense, not the maximum sentence allowed by the Sentencing Guidelines"). The maximum concurrent term is life imprisonment. The maximum consecutive term is two life sentences plus thirty-five years incarceration.

■■■ Provisional sentences are not appropriate in every case involving defendants who appear to be suffering from a mental defect. "Congress obviously envisioned the possibility that a defendant might be found to be suffering from mental defect or disease but that it would be unnecessary to commit that person for treatment in lieu of imprisonment." *United States v. Buker,* 902 F.2d 769, 770 (9th Cir.1990). For defendants who may suffer from some degree of mental illness but for whom traditional incarceration is appropriate, a court may recommend that the defendant be housed at a particular correctional facility, one that offers appropriate health services, without imposing a provisional sentence. *Id.*

■■ Appropriate Bureau of Prisons' medical facilities can provide adequate medical treatment for defendant. According to David Good, Chief Health Programs Branch National Health Systems Administrator of the Federal Bureau of Prisons, the Bureau has "six in-patient Medical Referral Centers that have approximately 750 in-patient/chronic care beds which address the spectrum of inmate health care needs consistent with the community standard of medical care" and is able to "care for patients with dementia, Alzheimer's disease, and cardio-vascular disease." (Letter of David Good of Dec. 15, 1997, at 1–2.)

Defendant has been found to be a malingerer whose claimed mental problems were exaggerated. *See United States v. Gigante,* —— F.Supp. ——, 1998 WL 94911 (E.D.N.Y. Jan. 5, 1998). He does have heart problems, but they have been treated appropriately and he is in a stable condition. Despite contentions of the defense that he probably could

not live through the tensions of a trial, defendant has survived without discernable physical deterioration.

Under these circumstances, a sentence pursuant to the Guidelines is appropriate. The interests meant to be served by rendering a provisional sentence—protection of mentally ill prisoners, protection of other inmates, and humanitarian treatment for the mentally ill—are not involved in this case where mental illness, if any, is slight. *See United States v. Abou–Kassem,* 78 F.3d 161, 165 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996). Defendant poses no immediate danger to himself or others, as demonstrated by his exemplary behavior while housed at the Butner Federal Correctional Institution.

## III. Presentence Recommendations

### A. Department of Probation

After a full hearing, the Department of Probation analysis and computations under the Guidelines were found to be essentially correct, except as noted below.

#### 1. Applicable Guidelines Range for Incarceration

The Presentence Report prepared by the United States Department of Probation indicates a combined total offense level of thirty-eight. Criminal history category is characterized as "II," based upon defendant's conviction for conspiring to violate federal narcotics laws in 1958. For that offense defendant was sentenced to seven years incarceration. Based upon these computations, the Guidelines range of imprisonment is between 262 to 327 months. Probation has recommended the maximum, 327 months.

#### 2. Fines and Cost of Imprisonment

Pursuant to Section 5E1.2(a) of the Guidelines, a monetary fine must be imposed unless defendant is able to establish (1) that he is unable to pay a fine and (2) that he is not likely to become able to pay any fine. Probation recommended a fine of $40,250,000 predicated upon assumptions not supported by the record. Based upon required modification of the Presentence Report, the maximum fine is $250,000 for each crime. 18 U.S.C. § 3571(b)(3); *see also United States*

*v. Sessa,* 821 F.Supp. 870, 874 (E.D.N.Y. 1993), *aff'd,* 32 F.3d 704 (2d Cir.1994). Permissible statutory modifications are not of appreciable significance. 18 U.S.C. § 3571(d).

Amendments to the Guidelines, effective November 1, 1997, deny the court the power to impose costs of incarceration upon a defendant. U.S.S.G § 5E1.2(d)(7).

#### 3. Restitution

The Sentencing Guidelines state that "[t]he court shall enter a restitution order ...." U.S.S.G. § 5E1.1 (a). Probation is not recommending restitution since no third party has sought compensation.

#### 4. Special Assessment

Special assessments "must be imposed on a convicted defendant in the amount prescribed by statute." U.S.S.G. § 5E1.3. Their purpose is the funding of the Crime Victims' Fund. U.S.S.G. § 5E1.3 comment. For each felony count for which defendant has been convicted, $50 must be assessed, leading to probation's recommendation of $250 in special assessments.

#### 5. Post–Incarceration Supervised Release

A term of supervised release is required to follow imprisonment whenever incarceration is for more than one year. U.S.S.G. § 5D1.1(a). The term of supervised release must be for at least three years, but not more than five years. U.S.S.G. § 5D1.2(a)(1), (2). Cumulation of supervised release terms may be permitted only in rare cases. *See United States v. Williams,* 65 F.3d 301, 309 (2d Cir.1995)(imposition of a ten-year period of supervised released based upon two five-year consecutive terms of supervised release). Probation has properly recommended a five-year term of supervised release.

### B. Prosecution

The prosecutor's view of the Guidelines' criteria is generally in accord with those of Probation. Nevertheless, the government argues that defendant should be sentenced with the full weight of the maximum sentence of incarceration permitted by the Guidelines and further moves for an up-

ward departure pursuant to Section 3553(b) of Title 18 of the United States Code and Sections 2B3.2, 4A1.3, 5K2.0, 5K2.7 and 5K2.9 of the Guidelines.. Specifically, the government argues that defendant should receive an upward departure for: (1) obstructing justice by feigning mental illness in order to avoid prosecution and sentence; (2) taking part in organized criminal activity; (3) "massive interference with government functions"; and (4) having a criminal history far more heinous than that recognized by the Guidelines.

An upward departure is not appropriate in view of defendant's physical disabilities and age.

### C. Defendant

■ The defendant contends that his criminal history category is I, not II. If accepted, his Guideline imprisonment range would be 210 to 262 months rather than 262 to 327 months. In view of defendant's long serious criminal history—established by a preponderance of the evidence—beginning no later than the 1960's, a reduction of his criminal history category would seriously understate his criminality as a gang boss and member of the ruling hierarchy of gang bosses. These criminal activities should be considered in evaluating defendant's criminal history even though they did not result in a conviction. *See United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).

■ Defendant further seeks a downward departure from the Guidelines based upon defendant's advanced age and physical infirmity. Because he is "a weak, old, and sick man," he seeks an "alternative sentence" of five years probation including "home detention and careful monitoring." Probation would be entirely inappropriate for this major, long-time criminal.

### IV. General Sentencing Considerations

■ Despite the rigidity of the Guidelines, a sentencing court must still independently judge each criminal before it, while fully protecting the community. This is never a completely mechanistic or facile process. At every sentencing, the trial judge must:

struggle with assessing whether an offender is beginning or ending a criminal career, appears to be dangerous or harmless ... or ... will not offend again ....

Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 Yale L.J. 1681, 1728 (1992); *see also*, Note, *Some Reflections on Seven Lean Years of Guidelines Sentencing*, 8 Fed.Sent.Rep. 12, 12 (July/August 1995) (There exists a "duty to provide individualized justice. Every person has a right to be treated as an individual, and to know that he or she has been so treated.").

Defendant was one of the nation's most notorious organized crime figures. He has long been a leader in the world of crime. He early on demonstrated youthful arrogance and a penchant for brazen violence.

By the 1970's, defendant was a Captain in the Genovese Crime Family. He soon rose to Consigliere. By the 1980's he was the behind-the-scenes power in the Genovese Family and in the Mafia generally.

After the 1985 Commission trial and the incarceration of Anthony Salerno (who was the figurehead street boss under Mr. Gigante), defendant publicly assumed the title of official boss of the family. He controlled a sprawling, predatory, illegal economic enterprise that siphoned millions of dollars from legitimate businesses and government through the control of corrupt unions and business leaders and the ominous, persistent threat of force and violence. He was ruthless in discipline of those who stood in his way, while suave and charming with those he loved or needed. He amassed great power and wealth.

Defendant is no longer that maleficent. He is a shadow of his former self—an old man finally brought to bay in his declining years after decades of vicious criminal tyranny. Familiar words of William Shakespeare are brought to mind:

And one man in his time plays many parts ...

Last scene of all,

That ends this strange eventful history,

Is second childishness ....

William Shakespeare, *As You Like It*, Act II, scene vii. "Of wanton youth, repents a painful age . . . ." Jasper Heywood, *Whom Minds to Bring his Ship- to Happy Shore, Must Care to Know the Lawes of Wysdomes ·Lore* (ca. 16th century), *in Book of Catholic Quotations* 149 (John Chapman ed., 1956).

While the ancient is in a sense a different person from who he was in his youth, deterring the young requires the law to insist that there be no escape from the whip of justice in aging. As Chief Judge Richard A. Posner reminds us:

> We must be careful not to push the concept of multiple selves to the point of saying that an old person may not be punished for crimes he committed when young because they are different selves. The pragmatic reason is that such a policy would reduce the effect of the threat of punishment in deterring crime . . . ,

Richard A. Posner, *Aging and Old Age* 90 (1995). If general and specific deterrence are to have any meaning, the criminal must assume that "[t]hough the mills of" law, like "the mills of God grind slowly, yet they grind exceedingly small." Friedrich Von Logau, *Retribution* (Henry Wadsworth Longfellow trans.), *in Bartlett's Familiar Quotations* 329 (Emily Morison Beck ed., 14th · ed.1968).

## V. Departures Under Guidelines

■ Section 4A1.3 of the Guidelines permits a horizontal departure from the applicable guideline range if "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3

The defense points out the defendant's prior 1958 conviction and period of incarceration upon which defendant's criminal history designation was based arguably is outside of the fifteen year period established by Section 4A1.2(e)(1) of the Guidelines. Even if this were the case, however, defendant's other extensive criminal conduct would permit a horizontal increase in criminal history category from I to II. *See United States v. Bauers*, 47 F.3d 535, 537–38 (2d Cir.1995) (allowing for horizontal departure based upon trial court's conclusion that criminal history category did not adequately reflect the seriousness of defendant's criminal history "because two state felony convictions, although consolidated at sentencing, were based upon separate crimes with separate victims"); *United States v. Mayo*, 14 F.3d 128, 131–32 (2d Cir.1994) (approving trial court's decision to increase criminal history category in fraud-based criminal prosecution because of defendant's two prior arsons even though the prior activities did not appear to be part of the same course of conduct as the fraudulent activities).

For example, by a preponderance of the evidence the government has demonstrated that defendant was partly responsible for the 1980's murders of Philadelphia mafiosi—Anthony Caponigro, Fred Salerno, Johnny "Keys" Simone, Frank Sindone, Frank "Chickie" Narducci, and Rocco "Rocky" Marinucci. A criminal history category of II appropriately characterizes defendant's criminal past.

The government is also correct in its assertion that defendant obstructed justice in a way not adequately covered by the Guidelines. While obstruction of justice has been taken into account by the Guidelines by way of adjustments, U.S.S.G. Ch. 3, pt. C, the Sentencing Commission never contemplated the long-term flouting through feigning insanity presented by this defendant. *United States v. Baez*, 944 F.2d 88, 89–91 (2d Cir. 1991) (upward departure permitted based upon "serious episode of obstructing justice"). Upward departure can also be based upon defendant's role as a sophisticated organized criminal and for his participation in "massive interference with government functions." U.S.S.G. §§ 2B3.2, 5K2.7; *see also, e.g., United States v. Gigante*, 94 F.3d 53, 57, n. 3 (2d Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 179, 139 L.Ed.2d 119 (1997) ("the Guidelines explicitly authorize upward departure on the basis of organized criminal activity"); *United States v. Khan*, 53 F.3d 507 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996)(upward departure permitted for disruption of government function in large-scale Medicade fraud

case). Upward departure in this case would, however, write a scene from the theater of the absurd—demonstrating a futile act of cruelty.

Defendant's life expectancy is limited. Donald N. Summers, M.D., on behalf of the defense, estimates his life expectancy at about four years from the time of his last cardiac surgery, which took place in December, 1996. Other documentation submitted by the defendant indicates that persons who have undergone aortic operations such as Mr. Gigante's generally have a survival rate of under five years.

This dismal prediction appears to be somewhat of an overstatement according to the prosecution both in light of defendant's prior history and because of the average life expectancy of 69 year old males. *See 1A New York Pattern Jury Instructions—Civil,* app. A at 1173 (3d ed.1996)(life expectancy of an additional 12.7 years). The government submits:

> According to one actuary, relying on the CSO (Bureau of Labor Statistics) table, a 69–year old male would have a life expectancy of 12 years; relying on an insurance company's current pricing [mortality] data, he would have a life expectancy of 18.6 years; relying on the same insurance company's non-smoking, substandard health rating, he would have a life expectancy of 14.2 years.

Gov't Letter of Dec. 17, 1997 at 1–2. A submission by Francis M. Weld, M.D. for the government forecasts defendant's "median survival rate" as "somewhat less than 10 years."

Based upon all the available data defendant has a substantial chance of surviving more than ten years in prison. Whatever nomenclature is utilized—outside the *heartland, atypical,* or *mitigating circumstance*—the Sentencing Commission did not contemplate a situation such as this one. Defendant is guilty of crimes committed some years ago when he was young, vigorous, and effectual. Now he is so infirm and aged that the long Guidelines-mandated sentence poses unnecessary dangers to his health and is effectively a life sentence.

While it could be argued that a more lenient sentence would encourage obstructionist activities such as those practiced by the defendant in feigning illness, the principle of modifying a sentence to take account of a defendant's frailty has strong and ancient roots. *See, e.g., The Code of Maimonides,* Book XIV, Treatise One: Sanhedrin, chap. 17, para. 1, Mishna Torah, The Book of Judges (Abraham M. Hershman, trans., Yale Univ. Press 1949)(emphasis omitted)("How many stripes are inflicted . . . as it is said: to be beaten . . . according to the measure of his wickedness . . . (Deut.25:6)... But the number is reduced in the case of a frail man . . . .").

The Supreme Court, emphasizing the "traditional exercise of discretion by a sentencing court," recently reaffirmed the Guidelines' mandate that the sentencing court determine when and whether a downward departure is appropriate:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

*Koon v. United States,* 518 U.S. 81, 98, 93, 116 S.Ct. 2035, 2046, 2044, 135 L.Ed.2d 392 (1996) (quoting U.S.S.G. Ch. 1, Pt. A intro. comment. 4(b)). If the "court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines,'" departure is appropriate. U.S.S.G. § 5K2.0 (*quoting* 18 U.S.C. § 3553(b)). As the court of appeals for the Second Circuit recently pointed out: "absent express prohibition, a sentencing court is free to consider, in an unusual case, whether or not the factors that make it unusual . . . are present in sufficient degree to warrant departure." *United States v. Core,* 125 F.3d 74, 77 (2d Cir.1997)(quotation marks and citation omitted).

Sentencing courts are permitted to take account of age and frailty. U.S.S.G. §§ 5H1.1, 5H1.4; *see United States v. Rioux*, 97 F.3d 648, 662–63 (2d Cir.1996)(defendant's medical condition resulting from a kidney transplant coupled with his prior civic good deeds permitted a ten point downward departure); *United States v. Baron*, 914 F.Supp. 660, 662–665 (D.Mass.1995)(departure from level 18 to level 10 for elderly and infirm defendant); *United States v. Moy*, 1995 WL 311441, at *25–29, *34 (N.D.Ill. May 18, 1995)(downward departure based upon defendant's advanced age, aggravated health condition, and emotionally depressed state); *United States v. Roth*, 1995 WL 35676, at *1 (S.D.N.Y. Jan.30, 1995)(sixty-three year old defendant with neuro-muscular disease had "profound physical impairment" warranting downward departure under the Guidelines); *United States v. LiButti*, 1994 WL 774647, at *10 (D.N.J. Dec.23, 1994)(downward departure when "defendant's combination of physical and mental conditions present an extraordinary situation in which prison life may be significantly harder to endure"); *see also Koon v. United States*, 518 U.S. 81, 96, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996)("If the special factor is a discouraged factor . . . depart only if the factor is present to an exceptional degree or in some other way make the case different from the ordinary case where the factor is present.") (citations omitted).

As in *United States v. Moy*, 1995 WL 311441, at *29 (N.D.Ill. May 18, 1995), defendant's "life would be both threatened and shortened if he was incarcerated for" the period suggested by the Guidelines; "a more limited period of incarceration would both serve all imprisonment goals and be less costly and more efficient." Defendant's fragile physical state, his advanced age, and a court's duty not to impose sentences that are excessively cruel argue strongly for a downward departure.

A period of incarceration of 12 years, with time off for good behavior, would probably be short of a life sentence. *See United States v. Ferranti*, 928 F.Supp. 206, 216 (E.D.N.Y.1996)(defendant's life expectancy taken into account for sentence imposed when sentence required to be less than life imprisonment); 18 U.S.C. § 3624 (fifty-four) days of good-time credit per year). In case of serious deterioration medical leave is possible. 18 U.S.C. § 3622(a)(3).

It is recommended that any sentence of imprisonment be served at the Federal Correctional Facility in Butner, North Carolina, one of the six Bureau of Prison facilities noted as "Medical Referral Centers." This facility is already familiar with defendant, his circumstances, and his medical needs.

■ Five years supervised release after release from prison is appropriate. Probation will be able to ensure during this period, that defendant refrains from criminal activities.

■ While defendant has made large profits from his crimes, he claims no assets. Yet, his wife and their children, as well as his paramour and their children, have been given elaborate homes and financial support. Defendant lacks nothing in medical and legal care and employees to take care of his personal needs. Based on the evidence defendant probably still has at his disposal substantial assets. *See United States v. Sessa*, 821 F.Supp. 870, 875 (E.D.N.Y.1993), *aff'd*, 32 F.3d 704 (1994)(severe fines imposed upon those involved in organized crime, even though there was no proof of assets, to "reimburse society for the drain on economic resources caused by their lives of crime and for the high costs of their own necessary imprisonment"). A large fine is desirable in this case.

## VI. Conclusion

Defendant must be sentenced both for what he was and what he is. Mr. Vincent Gigante is sentenced to twelve years in prison. It is recommended that this term be served at the Federal Correctional Facility at Butner, North Carolina, or at an equivalent medical-psychiatric correctional institution. He will receive fifty-four days per year for good behavior. 18 U.S.C. § 3624(b). In case of precipitous medical deterioration a medical release is possible. 18 U.S.C. § 3622(a)(3).

He is fined $1,250,000 and assessed $250. Interest shall begin to run on the fine fifteen days from today. 18 U.S.C. § 3612(f)(1). Defendant is also sentenced to five years supervised release to be served after incarceration. Should he violate the terms of supervised release he can be returned to prison for an additional long term.

So Ordered.